UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARTIN FAGAN by his agent Pamela Fagan and PAMELA FAGAN,<br>    *Plaintiffs*,<br>    *v.*<br>RODERICK L. BREMBY, in his official capacity as Commissioner of the Connecticut Department of Social Services,<br>    *Defendant.* | Civil No. 3:16cv73 (JBA)<br><br>March 21, 2017 |

**RULING ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs Martin Fagan ("Mr. Fagan") and Pamela Fagan ("Mrs. Fagan") filed this suit against Defendant Roderick L. Bremby, in his official capacity as Commissioner of the Connecticut Department of Social Services ("DSS"), on January 18, 2016, requesting injunctive relief from Defendant's decision to impose a transfer of assets penalty on Mr. Fagan that results in his being ineligible for Medicaid benefits until March 6, 2022. The parties now bring cross motions for summary judgment. For the following reasons, Plaintiffs' Motion [Doc. #31] for Summary Judgment is denied and Defendant's Motion [Doc. #28] for Summary Judgment is granted.

**I.    Background**

**A.  Medicaid: The Statutory Landscape**

The federal Medicaid program, enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., provides funding to States that assist persons with paying for medical care who have insufficient income and resources. *See* Social Security Act, tit. XIX, as added, 79 Stat. 343, and as amended, 42 U.S.C. § 1396 et seq. "Each participating State develops a plan containing reasonable standards . . . for determining eligibility for and the extent of medical assistance within

boundaries set by the Medicaid statute and the Secretary of Health and Human Services." *Wisconsin Dep't of Health & Family Servs. v. Blumer*, 534 U.S. 473, 479 (2002) (internal quotation marks and citations omitted). In formulating those standards, States must "provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant." 42 U.S.C. § 1396a(a)(17)(B).

In 1988 Congress amended Title XIX of the Social Security Act by passing the Medicare Catastrophic Coverage Act ("MCCA"). The purpose of the MCCA was both "to protect community spouses from 'pauperization' while preventing financially secure couples from obtaining Medicaid assistance." *Blumer*, 534 U.S. at 480 (citing H.R.Rep. No. 100-105, pt. 2, pp. 66-67 (1987)).[1] In order to achieve this goal, the MCCA established "a set of intricate and interlocking requirements with which States must comply in allocating a couple's income and resources." *Id.*

When an institutionalized spouse first applies to Medicaid, the State Agency totals the assets of both the institutionalized and the community spouse "*as of the beginning of the first continuous period of institutionalization . . . of the institutionalized spouse*," and divides that sum in half resulting in what is called a "spousal share." 42 U.S.C. § 1396r-5(c)(1)(A) (emphasis added). This spousal share then becomes the basis for the calculation of the "community spouse resource

---

[1] The MCCA accordingly contains a set of instructions called the "spousal impoverishment" provisions, which "permit a spouse living at home (called the 'community spouse') to reserve certain income and assets to meet the minimum monthly maintenance needs he or she will have when the other spouse (the 'institutionalized spouse') is institutionalized, usually in a nursing home, and becomes eligible for Medicaid." *Blumer*, 534 U.S. at 478.

allowance" ("CSRA").[2] 42 U.S.C. § 1396r-5(f)(2). Thus, at the "initial determination of eligibility,"
the State Medicaid Agency treats "the resources held by either the institutionalized spouse, the
community spouse, or both" to be available to the institutionalized spouse, 42 U.S.C. § 1396r-
5(c)(2)(A), except that "the CSRA is considered unavailable to the institutionalized spouse . . . [so]
all resources above the CSRA (excluding a . . . personal allowance reserved for the institutionalized
spouse . . .) must be spent before eligibility can be achieved." *Blumer*, 534 U.S. at 482-83 (citing 42
U.S.C. § 1396r-5(c)(2)). In other words, aside from the calculated CSRA, all other community
resources are considered in determining whether an institutionalized spouse is eligible for
Medicaid, meaning that if the remaining resources exceed the Medicaid limit, the institutionalized
spouse must "spend down" the remaining resources to qualify. (Ex. 2 (HHS Amicus Brief in
*Hughes*) to Def.'s Mem. Supp. Mot. for Summary Judgment at 8.) This statutory scheme permits
the institutionalized spouse to qualify for Medicaid while also allowing the community spouse to
retain the CSRA to support him or herself.

When reviewing an application, the State Agency will also check that neither spouse
disposed of any assets for less than fair market value "on or after the look-back date," which is
defined as 60 months before "the first date as of which the individual both is an institutionalized
individual and has applied for medical assistance under the State plan." 42 U.S.C. §
1396p(c)(1)(A)-(B).[3] Any such disposition of assets would result in a "penalty period" of

---

[2] In Connecticut the CSRA is called the "community spouse protected amount" ("CSPA"),
but the Court will refer to it as the CSRA throughout this opinion.

[3] This is referred to as the "look-back period" in this Ruling. *See* 42 U.S.C. § 1396p(c)(B)(i).

3

ineligibility.[4] However, there is an exemption (referred to as the "unlimited transfer exception") from this penalty period where the assets were transferred to the individual's spouse during the look-back period for the sole benefit of the spouse. § 1396p(c)(2)(B).

As explained by the Centers for Medicare & Medicaid Services ("CMS"),[5] "the unlimited transfer exception should have little effect on the eligibility determination, primarily because resources belonging to both spouses are combined in determining eligibility for the institutionalized spouse. Thus, resources transferred to a community spouse are still . . . considered available to the institutionalized spouse for eligibility purposes." (Def.'s Ex. 1 (State Medicaid Manual § 3258.11).)[6] However, once the institutionalized spouse has commenced a continuous period in which he is in an institution and "after the month in which [he] is determined to be eligible for benefits . . . no resources of the community spouse shall be deemed available to the institutionalized spouse." 42 U.S.C.A. § 1396r-5(c)(4). An institutionalized spouse does have an opportunity to transfer assets to the community spouse "as soon as practicable after the date of the initial determination of eligibility," but only "in an amount equal to the community spouse

---

[4] If a penalty period is imposed, the institutionalized spouse will be ineligible "for the number[ ] . . . of months that the assets would have covered the average monthly cost of such services." *Hughes v. McCarthy*, 734 F.3d 473, 476 (6th Cir. 2013) (citing 42 U.S.C. § 1396p(c)(1)(A), (B)(i-ii), (C)(i)(I), D(ii), (E)(i)). This is also referred to as a "transfer of assets penalty."

[5] CMS is the division within the United States Department of Health and Human Services ("HHS") that sets Medicaid policy.

[6] This view is also articulated by HHS in its amicus brief. (*See* Ex. 2 to Def.'s Mem. Supp. Mot. for Summary Judgment at 7) ("prior to an eligibility determination, transfers between spouses or between either spouse and a third party for the sole benefit of either spouse as provided in Section 1396p(c)(2)(B)(i) have little, if any, effect on Medicaid eligibility because the assets of both spouses are pooled together and deemed to be available to the institutionalized spouse. Section 1396r-5(c)(1)(A)(i).").

resource allowance." 42 U.S.C. § 1396r-5(f)(1). It is the meaning of this phrase—"initial determination of eligibility"—in Section 1396r-5(f)(1) that controls disposition of this case.

### B.  Facts

After Mr. Fagan was severely injured in a motorcycle accident in June 2011, he was moved into Masonicare, a skilled nursing facility in Wallingford, Connecticut, where he has resided ever since. (Ex. 3 to Def.'s Mot. [Doc. # 28] for Summary Judgment ¶¶ 3, 5.) He applied to DSS for Medicaid long-term care benefits in February 2012 and was approved, effective March 1, 2012.[7] (*Id.* ¶¶ 6, 11.) Mr. Fagan continued to receive Medicaid coverage for long-term care services for the cost of his nursing home care until May 31, 2015, when his benefits were discontinued because in April he received a $2 million personal injury settlement,[8] which pushed Mr. Fagan over the Medicaid asset limit. (Pl.'s Local Rule 56(a) stmt. ("Pl.'s LR 56") ¶ 10.) After payment of attorney's fees, medical bills not covered by Medicaid, a Medicare lien, and repayment of $233,037.77 to the Connecticut Department of Administrative Services pursuant to the Medicaid Recovery Act, his

---

[7] DSS determined Plaintiffs' CSRA was $115,240.00, representing $1,600 for Mr. Fagan as the institutionalized spouse and $113,640 for Mrs. Fagan. (Ex. 3 to Def.'s Mot. for Summary Judgment ¶ 10.)

[8] DSS became aware of the lawsuit and subsequent settlement through Plaintiffs' attorney for the personal injury case in April 2012. (*See* Ex. 3, Attachment G (Letter from Attorney Donna R. Levine to DSS) to Def.'s Mem. Supp. Mot. for Summary Judgment.) On May 8, 2012 DSS sent Plaintiff notice his benefits would be discontinued effective May 31 due to his receipt of the settlement check, which placed him over the $1,600 asset limit for Medicaid eligibility. (Ex 3 to Def.'s Mot. for Summary Judgment ¶ 14.)

net proceeds were $966,102.69.[9] (Ex. 3 (Affidavit of Laura Catarino)[10] to Def.'s Mot. for Summary Judgment ¶ 12.)

On August 12 and September 23, 2015, several months after his coverage was discontinued, Mr. Fagan transferred $879,453.32 of his settlement proceeds to his wife in two transactions. (Pl.'s LR 56 ¶¶ 12, 13.) The amount of the first transfer, $581,453.32, is equivalent to the amount Mrs. Fagan paid for the purchase of her primary residence in Florida.[11] (*Id.* ¶ 12.) She subsequently purchased an actuarially sound single premium annuity with the money from the second transfer.[12] On September 30, 2015 Mr. Fagan reapplied for Medicaid long-term care, by which time his wife's assets countable by the Medicaid program were less than the CSRA she was allowed to retain without affecting her husband's Medicaid eligibility. (*Id.* ¶¶ 15, 17.)

Upon review of Mr. Fagan's reapplication for Medicaid long-term care benefits, DSS determined that the August 12 and September 23 transfers of funds from Mr. Fagan to Mrs. Fagan constituted improper transfers of assets for less than fair market value. (Ex. 3 to Def.'s Mot. for

---

[9] Mrs. Fagan also received a personal injury settlement–with a net recovery of $948,964.10. (Ex. 3 to Def.'s Mot. for Summary Judgment ¶ 13.) Her recovery did not affect Mr. Fagan's ongoing Medicaid eligibility because of the "separate treatment of resources" requirement of 42 U.S.C. § 1396r-5(c)(4). (Def.'s Mem. [Doc. # 28-1] Supp. Mot. for Summary Judgment at 8 n. 7.)

[10] Ms. Catarino is a public assistance consultant for DSS who is familiar with Mr. Fagan's Medicaid case.

[11] 42 U.S.C. § 1396p(c)(2)(A)(i) provides that "[a]n individual shall not be ineligible for medical assistance . . . to the extent that the assets transferred were a home and title to the home was transferred to the spouse of such individual."

[12] "An annuity that satisfies various conditions does not qualify as a resource." *Morris v. Oklahoma Dep't of Human Servs.,* 685 F.3d 925, 932-33 (10th Cir. 2012) (citing § 1396p(c)(1)(G)). As the Medicaid regulations explain, "[i]f a property right cannot be liquidated, the property will not be considered a resource of the individual (or spouse)." 20 C.F.R. § 416.1201.

Summary Judgment ¶ 18.) On December 7, 2015 DSS sent Mr. Fagan a Preliminary Decision Notice (a W-495A form) informing him of its decision that the transfers totaling $952,006.52[13] to Mrs. Fagan were improperly transferred assets. (*Id.* ¶ 19.) Mr. Fagan disputed DSS's preliminary decision, arguing that because the transfers to his wife were pre-eligibility transfers they were exempt from § 1396r-5(f)(1)'s CSRA cap. (*Id.* ¶ 20.) However, DSS disagreed and issued its final decision notice on December 22, 2015 affirming its conclusion that Mr. Fagan improperly transferred assets to Mrs. Fagan, and consequently imposing a transfer of assets penalty precluding Mr. Fagan from receiving any Medicaid long-term benefits until March 7, 2022.[14] (*Id.* ¶ 22; Pl.'s LR 56 ¶ 22.) Mr. Fagan is now responsible for paying his monthly Masonicare bill of approximately $13,000. (Pl.'s LR 56 ¶ 25.)

## II.    Discussion[15]

---

[13] There is a discrepancy between the amount Plaintiffs claim Mr. Fagan transferred to Mrs. Fagan and the amount computed by DSS. However, this is not a fact that is material under Rule 56 to the question of whether Mr. Fagan could transfer funds in excess of the CSRA to his wife because using either amount Mr. Fagan's transfer would have resulted in an asset penalty.

[14] The Final Decision Notice reads: "[a]though you are eligible for certain Medicaid benefits beginning 9/2015, we are setting up a penalty period starting 9/30/2015. This penalty ends 3/6/2022. During this time, Medicaid will not pay for any long-term care services." (Ex. E to Compl.) This penalty period was calculated based upon the number of months that the assets Mr. Fagan improperly transferred would have covered the monthly cost of the services. *See Hughes v. McCarthy*, 734 F.3d 473, 476 (6th Cir. 2013) (citing 42 U.S.C. § 1396p(c)(1)(A), (B)(i-ii), (C)(i)(I), D(ii), (E)(i)).

[15] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case

**A.  There is no Factual Dispute and Only The Single Legal Issue**

Neither party claims any material factual dispute, and therefore this case is appropriate for disposition by summary judgment on the legal issue of whether the penalty DSS imposed on Mr. Fagan for his transfer of assets to his wife was lawful. Both parties agree that (1) Mr. Fagan was institutionalized in 2011, and has been continuously institutionalized since that time (Pl.'s LR 56 ¶ 2; Ex. 3 to Def.'s Mem. Supp. Mot. for Summary Judgment ¶ 3); (2) Mr. Fagan began receiving Medicaid benefits in early 2012, and continued to receive them until they were discontinued on May 31, 2015 because Mr. Fagan was over the asset limit (Pl.'s LR 56 ¶¶ 7, 10; Ex. 3 to Def.'s Mem. Supp. Mot. for Summary Judgment ¶¶ 11, 14); and (3) between May 31, 2015 and Mr. Fagan's subsequent reapplication in September 2015, Mr. Fagan transferred his personal injury settlement proceeds to Mrs. Fagan (Pl.'s LR 56 ¶¶ 12, 13; Ex. 3 to Def.'s Mem. Supp. Mot. for Summary Judgment ¶¶ 15, 16).

The Court must decide whether, once Mr. Fagan was originally determined eligible for Medicaid in 2012, the limits on spousal transfers found in 42 U.S.C. § 1396r-5(f)(1) continued to apply to Mr. Fagan's transfers of assets to Mrs. Fagan made after his benefits had been discontinued but before he reapplied for Medicaid; or whether this limitation provision does not apply and §

---

will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c). The same standard applies to cross-motions for summary judgment. *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). The court must examine the merits of each motion independently and in each case must consider the facts in the light most favorable to the non-moving party. *Id.* at 121.

1396p(c)(2)(B)'s "unlimited transfer exception" should be the controlling statutory provision in these circumstances.

After the initial determination of eligibility, assets belonging to the institutionalized spouse and the community spouse are treated separately for purposes of determining the institutionalized spouse's ongoing Medicaid eligibility and "if [after initially being determined eligible] the institutionalized spouse attempts to transfer newly received resources . . . he will face a penalty." *Morris v. Oklahoma Dep't of Human Servs.,* 685 F.3d 925, 937 (10th Cir. 2012). The question is thus whether, with respect to a single continuous period of institutionalization, the "initial determination" in § 1396r-5(f)(1) refers only to the State Agency's first determination of an applicant's eligibility for Medicaid benefits, as Defendant contends, or as Plaintiffs argue, that "initial determination" also refers to a second application where an individual who, after having been deemed eligible and receiving benefits for a period of time, loses eligibility and then reapplies for benefits all while continuously institutionalized. Plaintiffs argue that Mr. Fagan's second application for benefits, although for future coverage on the same continuous period of institutionalization as his first application, constitutes a separate "initial determination of eligibility" resulting in a reversion back to the pre-eligibility transfer of assets rules. Defendant maintains that once Mr. Fagan became eligible for Medicaid and was institutionalized, thereby triggering the statute's separate treatment of resources provision, he and his wife's resources were to be treated separately and any subsequent transfer by Mr. Fagan to Mrs. Fagan while he remained

institutionalized would violate the statute unless it complied with the limited exception in § 1396r-5(f)(1).[16]

### B. Neither the Courts nor HSS have Addressed Whether a Break in Eligibility After the Initial Determination Resets the Process

The applicability of Section 1396r-5(f)(1) to the Fagans' circumstances presents a case of first impression. Plaintiffs and Defendants rely almost exclusively on their different interpretations of *Morris*, 685 F.3d 925 (10th Cir. 2012) and *Hughes v. McCarthy*, 734 F.3d 473 (6th Cir. 2013), neither of which directly addresses the issue here, as well as an HHS amicus brief filed in *Hughes*, and two letters from CMS responding to questions from States regarding compliance of their policies with federal law.[17]

Plaintiffs claim that the circumstances in *Morris*, 685 F.3d 925 are identical to the Fagans' except for differences in time periods between the applications and that factually *Hughes*, 734 F.3d 473 is not materially different from their own case. However, there are important distinctions. Neither *Morris* nor *Hughes* involved an institutionalized spouse who reapplied for Medicaid benefits after having earlier received benefits with respect to a continuous period of institutionalization, as Mr. Fagan did. Nor did the institutionalized spouses in *Morris* or *Hughes*

---

[16] Mr. Fagan does not contend that he is entitled to retroactive coverage for the months before he reapplied for Medicaid, but rather that his coverage should recommence from the date his second application was processed.

[17] "To the extent that HHS has issued guidance on the federal Medicaid statutes in the form of [the amicus brief and opinion letters] that lack the force of law, its statutory interpretations are not afforded deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), but are entitled to respect under . . . *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944), only to the extent that those interpretations have the power to persuade." *Hughes v. McCarthy*, 734 F.3d 473, 478 (6th Cir. 2013) (internal citations and quotation marks omitted).

transfer assets to their community spouse after their benefits were discontinued because they were over the asset limit and before submitting a second application for Medicaid benefits. Therefore, although both *Morris* and *Hughes* analyzed Section 1396r-5(f)(1), at issue here, which permits transfer as soon as practicable after the eligibility determination in an amount less than the CSRA, neither did so under the critical factual circumstances presented by the Fagans.

In *Morris* the institutionalized spouse applied for Medicaid but was denied because she and her community spouse had assets over the asset limit. 685 F.3d at 928. In an effort to spend down her assets so that she could qualify for Medicaid, the institutionalized spouse purchased a federally approved annuity paying benefits to her husband, the community spouse. *Id.* After her purchase of this annuity, the institutionalized spouse again applied for Medicaid. *Id.* The State Medicaid Agency imposed a transfer of assets penalty finding that the institutionalized spouse's purchase of the annuity for the community spouse was a transfer of assets for less than fair market value within the look-back period in violation of Sections 1396p(c)(1) and 1396r-5(f)(1) and thus concluded that the institutionalized spouse was ineligible for Medicaid. *Id.*

*Morris* focused on whether "initial determination of eligibility" refers only to a determination that the institutionalized spouse was in fact eligible for benefits, as those plaintiffs argued, or whether the denial of Medicaid benefits also constitutes an "initial determination" triggering Section 1396r-5(f)(1)'s spousal limit. The Tenth Circuit held that the limitations on spouse-to-spouse transfers only apply in cases where the applicant was determined to be eligible for Medicaid because "an agency's denial of Medicaid benefits is not a watershed moment; a determination that an individual is eligible, however, results in a dramatic change." *Id.* at 937. The court reasoned that § 1396r-5(f)(1) is not triggered upon the State Medicaid Agency's finding that an applicant is ineligible because from that finding the "couple merely learns that they must spend

down further in order to become eligible, and all resources – irrespective of which partner holds title – continue to affect the institutionalized spouse's eligibility for Medicaid." *Id.* The court found further support for its conclusion in 42 U.S.C. § 1396r-5(c)(4), under which the separate treatment of resources for a couple applies only after an institutionalized spouse is determined eligible for Medicaid. *Id.*[18]

*Hughes* similarly involved a pre-eligibility transfer of assets where the institutionalized spouse had never previously been determined to be eligible. There, the institutionalized spouse had paid her own costs at a nursing facility for about four years. Before she applied for Medicaid, the community spouse purchased an annuity for $175,000 that paid benefits only to him. 734 F.3d at 477. The institutionalized spouse then applied for Medicaid three months later and the State Medicaid Agency imposed a transfer of assets penalty on the institutionalized spouse because her community spouse "used a community resource in an amount that exceeded his CSRA." *Id.* The Sixth Circuit held that the transfer was allowed without penalty under § 1396p(c)(2)(B) because "§ 1396r-5(f)(1) 'has nothing to say about the inter-spousal transfers that are permissible before a determination of eligibility'" and that 42 U.S.C. § 1396r-5(f)(1) only applies to transfers "after the

---

[18] Plaintiffs here contend that in *Morris* the Tenth Circuit rejected DSS's argument "that the cap on transfers to a spouse applies once there has been an initial eligibility determination, even though there has been a subsequent period of ineligibility, the applicant has made a second application, and there has been a second eligibility determination." (Pl.'s Mem. Supp. Mot. for Summary Judgment at 6.) However, in actuality, what the court rejected was the argument that a determination of *ineligibility* triggers the limitations on spouse-to-spouse transfers. *See Morris,* 685 F.3d at 937 ("[W]e see no reason why a determination of ineligibility would justify different transfer rules" than those in effect prior to that determination).

date of the initial determination of eligibility." *Id.* at 479-80 (emphasis in the original) (internal citations and quotation marks omitted).

Therefore, *Morris* and *Hughes* stand for the proposition that § 1396r-5(f)(1) applies only where the individual makes the transfer after he or she has been deemed eligible for Medicaid, rather than (1) where the transfer was made after the Agency initially determined that the institutionalized individual was not eligible, as in *Morris*; or (2) where the transfer was made after the institutionalization period had begun but before the institutionalized individual applied for benefits, as in *Hughes*. Thus, these cases do not inform the precise determination here: whether, when Mr. Fagan, while still institutionalized, reapplied for benefits in 2015 after they had been discontinued because he had surpassed the asset limit, Agency approval of his second application would still be considered "the initial determination of eligibility" relating to the same continuous period of institutionalization, or whether the whole process re-set with the second application and Agency's determination that Mr. Fagan was again eligible for benefits.

### C.  The Transfer of Asset Penalty Imposed by Defendant was Proper

#### i.   *Statutory Construction*

The critical question in this case is which provision, 42 U.S.C. § 1396r-5(f)(1) or § 1396p(c)(2)(B), applies to Mr. Fagan's transfers of assets to Mrs. Fagan. Generally, where an individual "disposes of assets for less than fair market value on or after the look-back date" he will not be eligible for Medicaid. 42 U.S.C. 1396p(c)(1)(A). However, "a transfer of assets penalty will not be assessed for transfers that occur during the look-back period where assets were transferred 'to the individual's [institutionalized spouse's] spouse or to another for the sole benefit of the individual's spouse.'" (Def.'s Mem. Supp. Mot. for Summary Judgment at 5-6 (quoting 42 U.S.C. §

1396p(c)(2)(B)(i)).) If this look-back Section applies to Mr. Fagan's second Medicaid application, as Plaintiffs contend, Mr. Fagan's transfers would be a permissible exception to the limits on transfers. But, Section 1396r-5(f)(1) only permits a transfer of assets to be done "as soon as practicable after the date of the initial determination of eligibility."[19]

These two sections work in tandem, each applying to a different temporal period, to provide couples with the opportunity to reallocate their assets between them so that the institutionalized spouse's resources do not exceed the Medicaid limit.[20] Section 1396p(c)(2)(B) permits unlimited redistribution prior to the Agency's determination that the institutionalized spouse is eligible for benefits, and Section 1396r-5(f)(1) gives the couple the opportunity to correct

---

[19] Mr. Fagan's transfers were indisputably in excess of "an amount equal to the community spouse resource allowance" for Mrs. Fagan and were made long after DSS's first determination of Plaintiff's eligibility. *See* 42 U.S.C. § 1396r-5(f)(1).

[20] Defendant argues that Section 1396(f)(1) controls by reason of Section 1396r-5(a)(1)'s supersedence provision because the two sections conflict with one another. *See* 42 U.S.C. § 1396r-5(a)(1) ("In determining the eligibility for medical assistance of an institutionalized spouse . . . the provisions of this section supersede any other provision of this subchapter . . . which is inconsistent with them.). However, HHS has taken the position that the two Sections pertain to different time periods and thus are not inconsistent with one another. *See Hughes v. McCarthy*, 734 F.3d 473, 480 (6th Cir. 2013) ( "HHS has taken the same position in a series of opinion letters issued to state plan administrators and to the public, reasoning that § 1396r–5(f)(1) does not conflict with, and thus does not supersede, § 1396p(c)(2)(B), as the two provisions apply to different situations, before and after eligibility is established; and that permitting inter-spousal transfers under § 1396p(c)(2)(B) does not render § 1396r–5(f)(1) a nullity, as the latter provision still has meaning with respect to resource allocation after eligibility is established."); *see also Morris*, 685 F.3d 925; (Ex. 2 to Def.'s Mem. Supp. Mot. for Summary Judgment); (Ex. 1 (HHS Letters) to Pl.'s Statement [Doc. # 33] of Material Facts.) Although Defendant specifically disagrees with the language in *Hughes*, the Court need not decide if there is a conflict between the spousal transfer limit in Section 1396r-5(f)(1) and 1396p(c)(2)'s unlimited transfer exception because whether by supersedence or by virtue of the two provisions simply applying to different time periods, it is clear that Section 1396p(c)(2)(B) applies to pre-eligibility transfers of assets while Section 1396r-5(f)(1)'s limited transfer exception controls after the initial determination of eligibility.

any issues with regards to the titling of assets "as soon as practicable" after the applicant is first deemed eligible.[21] Defendant thus concludes that, by implication, aside from 1396r-5(f)(1)'s limited exception, any transfer to the community spouse made after the Agency first determines that the institutionalized spouse is Medicaid eligible for that period of institutionalization is prohibited by the statute. This Court agrees. If Section 1396p(c)(2) permitted an eligible institutionalized spouse who subsequently acquired disqualifying excess assets and who thus lost eligibility, to transfer those excess assets to the community spouse and seek resumption of Medicaid benefits without consequence, there would have been no need for Congress to create the specific limited exception of Section 1396r-5(f)(1). *See e.g., United States Olympic Comm. v. Intelicense Corp.*, 737 F.2d 263, 266 (2d Cir. 1984) ("[R]ules of statutory construction require a statute to be construed to give force and effect to each of its provisions rather than to render some of them meaningless.").

---

[21] In its amicus brief in *Hughes,* HHS notes that

Section 1396r-5(f)(1) was designed to serve a limited and somewhat different purpose than Section 1396p(c)(2)(B)(i). It is basically a "clean up" provision. If, after the date of eligibility, assets within the CSRA remain in the institutionalized spouse's name, the institutionalized spouse may transfer those assets to (or for the sole benefit of) the community spouse "as soon as practicable after the date of the initial determination of eligibility." 42 U.S.C. 1396r-5(f)(1). A failure to make such a transfer would lead to the denial of Medicaid eligibility when it came time for the institutionalized spouse's first eligibility redetermination – which must take place at least once every 12 months, *see* 42 C.F.R. 435.916(a).

(Ex. 2 to Def.'s Mem. Supp. Mot. for Summary Judgment at 8.)

The central dispute then, is what constitutes "the initial determination of eligibility," as the phrase is used in Section 1396r-5(f)(1).[22] The Court first examines whether the language of the statute itself "has a plain and unambiguous meaning with regard to the particular dispute in the case." *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). Here, the inquiry is whether use of the word "initial" means that the phrase "initial determination of eligibility" was intended to apply to each continuous period of institutionalization, or whether it corresponds to each new application for Medicaid benefits such that a break in eligibility resets the process.[23]

Defendant argues that "[b]y its plain language an 'initial determination' cannot mean a second determination of eligibility with respect to the same period of institutionalization." (Def.'s Mem. Supp. Opp'n to Summary Judgment at 10.) According to Webster's Dictionary, "initial" means "of or relating to the beginning," and thus, according to Defendant, this "would logically be the first finding that an applicant is eligible for Medicaid." (*See* Def.'s Mem. Supp. Mot. for Summary Judgment at 18.) In opposition, Plaintiffs claim that the only significance of the word "initial" is to distinguish between the first determination the Agency makes on an application for

---

[22] This phrase is referenced in two other places in the statute. Section 1396r-5(c)(2), titled "Attribution of resources at time of initial eligibility determination," refers to the period during which the State Agency decides whether an applicant is eligible for Medicaid. Additionally, Section1396a(e)(13)(A)(iii) provides that "[t]he State may apply the provisions of this paragraph when conducting *initial determinations of eligibility*, redeterminations of eligibility, or both, as described in the State plan." 42 U.S.C.A. § 1396a(e)(13)(A)(iii) (emphasis added).

[23] Defendant indicates that the limit on spouse-to-spouse transfers after the initial determination of eligibility applies only when there has been a continuous period of institutionalization. Therefore, "if the institutionalized spouse's condition improves and he is discharged, the entire process may reset, allowing unlimited spouse-to-spouse transfers again." (Def.'s Reply to Pl.'s Opp'n at 3.)

Medicaid and its subsequent redeterminations of a beneficiary's eligibility.[24] (Pl.'s Mem. Supp. Opp'n to Summary Judgment at 2.)

The flaw in Plaintiff's argument regarding the significance of the word "initial" is that because they acknowledge that Mr. Fagan could not have made the transfers at issue prior to a redetermination without penalty, allowing Mr. Fagan to make these same prohibited transfers after his benefits were discontinued (upon redetermination) without penalty would essentially allow him to bypass the transfer limits essential to the statute's purpose. The Court sees no convincing reason why the language of the MCCA should be interpreted to give an institutionalized individual, found ineligible for benefits upon redetermination, a second opportunity to make transfers to his spouse prohibited at the time of his initial eligibility determination when the coverage relates to the same period of institutionalization. As Defendant reasons, the logical reading of the statute's plain language is that the *initial* determination of eligibility attaches not to each application for Medicaid, but rather to each continuous period of institutionalization regardless of the outcomes of renewal determinations during that period of care. Absent any language in the statute intimating that it was the intent of Congress to link the initial determination of eligibility to each new application for the same institutionalization, the Court interprets the word "initial" as encompassing only the very first determination declaring an individual eligible for Medicaid with respect to a single period of institutionalization.

---

[24] "[T]he eligibility of Medicaid beneficiaries . . . must be renewed once every 12 months, and no more frequently than once every 12 months." 42 C.F.R. § 435.916(a)(1). However, "the agency must [also] promptly redetermine eligibility between regular renewals of eligibility . . . whenever it receives information about a change in a beneficiary's circumstances that may affect eligibility." *Id.* § 435.916(d)(1). It appears this is the way in which Mr. Fagan's eligibility was revoked.

Because Section 1396r-5(f)(1) permits a limited transfer only "as soon as practicable" after the first determination of eligibility relating to one continuous period of institutionalization, and is silent about subsequent redeterminations resulting in discontinuation of benefits for that same period, a post-transfer application to resume benefits cannot constitute the "initial determination."

<ul><li><em>ii.     The Dual Purposes of the Statute</em></li></ul>

In addition to the fact that the plain language of the statute is logically read as limiting the initial determination of eligibility to the first occasion where the Agency deems an individual eligible for Medicaid for a single period of institutionalization, this reading is also consistent with the dual purposes of the statute "to protect community spouses from 'pauperization' while preventing financially secure couples from obtaining Medicaid assistance." *See Blumer*, 534 U.S. at 480 (citing H.R.Rep. No. 100-105, pt. 2, pp. 66-67 (1987)). Medicaid is intended to assist "needy persons for the cost of medical care" and Mr. Fagan was such a person when he first applied in February 2012 because he and his wife's assets fell below the necessary threshold. *See id.* at 479. But, that status changed after he recovered nearly a million dollars in proceeds from a lawsuit, significantly ameliorating his financial position such that he no longer qualified for benefits.[25]

Plaintiffs contend that interpreting the statute as preventing Mr. Fagan from making transfers to his wife after his eligibility was revoked "would limit any inter-spousal transfers forever and ever, for years or decades, despite [the individual's] Medicaid eligibility having been terminated." (Pl.'s Mem. Supp. Opp'n to Summary Judgment at 2.) Plaintiffs' argument overlooks that Mr. Fagan's period of ineligibility is mathematically linked to the period of time his excess

---

[25] Nor was Mrs. Fagan, who recovered close to a million dollars herself, at risk of "pauperization." *See Blumer*, 534 U.S. at 480.

assets would cover the cost of his care, which is entirely consistent with the statute's purpose to prevent couples with the means of paying for their own care from receiving Medicaid benefits.[26]

It is difficult to imagine that Congress intended that an institutionalized spouse, upon inheriting or otherwise acquiring substantial assets after having initially been determined eligible for Medicaid, could wait for the Agency to determine he was no longer eligible for benefits and then transfer those assets to his spouse and successfully reapply for Medicaid.[27] This would create a loophole enabling couples with sufficient assets to pay for the institutionalized spouse's care to remain on Medicaid with little interruption of benefits, which flies in the face of Congress' clear expression that the MCCA was meant to "prevent[] financially secure couples from obtaining Medicaid assistance." *See Blumer*, 534 U.S. at 480 (citing H.R.Rep. No. 100-105, pt. 2, pp. 66-67 (1987)). This legislative goal is better served by construing the phrase "initial eligibility determination" as referring only to the very first determination by State Medicaid Agency declaring an applicant eligible with respect to one continuous period of institutionalization.[28]

---

[26] Additionally, if Mr. Fagan's condition were to improve, resulting in his discharge from the institution, the entire process would reset, allowing him to transfer assets to his spouse without limit, thereby refuting Plaintiffs' argument that Defendant's interpretation would prohibit inter-spousal transfers indefinitely.

[27] Plaintiffs contend that because Medicaid is generally determined on a monthly basis, an individual could successfully reapply just one month after having his benefits discontinued without being penalized.

[28] Plaintiffs creatively argue that because Mr. Fagan repaid DSS for all of the Medicaid benefits he had received prior to the new application "[f]or all intents and purposes he had never been on Medicaid at all." (Pl.'s Mem. Supp. Opp'n to Summary Judgment at 2.) However, Plaintiffs were required by law to repay those expenses and they point to no authority that this is somehow significant when making a subsequent determination of an individual's eligibility for Medicaid. *See* 42 U.S.C. § 1396a(a)(25)(A)-(B), (H); Conn. Gen. Stat. §§ 17b-93, 17b-94.

### iii.    Morris' Watershed Moment

Finally, although *Morris* dealt with a different benefits posture, its analysis of the "initial determination of eligibility" as a "watershed moment" provides a useful construct. In *Morris* the court unequivocally held "that § 1396r-5(f)(1)'s limit on spousal transfers applies only after a State Agency has declared the institutionalized spouse *eligible* for Medicaid benefits," 658 F.3d at 928 (emphasis added), because this, unlike when an individual is *denied* benefits, "results in a dramatic change" *id.* at 937.[29]

Plaintiffs thus argue that because Mr. Fagan was deemed *ineligible* by DSS as of May 31, 2015, the spousal transfer limit is inapplicable. (Pl.'s Mem. Supp. Mot. for Summary Judgment at 5.) However, this argument fails to account for the fact that unlike in *Morris*, prior to that determination of ineligibility DSS had already determined that Mr. Fagan was eligible for Medicaid for that very same period of institutionalization. Therefore, Defendant asserts that once "Mr. Fagan's application was granted, Mr. Fagan's ongoing eligibility depended solely on his assets" and "[t]he only assets Mr. Fagan could transfer to Mrs. Fagan after his Medicaid application was approved were assets up to the CSRA, and he was required to do so 'as soon as practicable after the date of the initial determination of eligibility.' 42 U.S.C. § 1396r-5(f)(1)." (Def.'s Mem. Supp. Mot. for Summary Judgment at 16.) The Court agrees with this analysis.

Moreover, if an individual could simply transfer newly acquired assets after his benefits were discontinued and then reapply for Medicaid for that same period of institutionalization, the

---

[29] *Hughes* likewise held that § 1396(f)(2) is irrelevant "before a determination of eligibility" but says nothing about what constitutes an initial determination of eligibility. *See* 734 F.3d at 480.

"watershed moment" of initially being granted Medicaid benefits would lose any significance. Instead, the moment of "initial determination" would be like a water faucet whose flow was controlled by the institutionalized spouse, with eligibility turned on and off, resulting in multiple cycles of applications, eligibility determinations, ineligibility determinations, and reapplications. This would allow any institutionalized spouse to transfer any newly obtained assets to his or her community spouse as soon as he or she went off Medicaid only to go back on the next month after the assets were transferred. Were the statute read to permit this, there would be no "dramatic change" as emphasized in *Morris*, given the fluidity between going on and off Medicaid that such a reading compels.

Given the clear asset consequences that relate to eligibility, the *initial* eligibility determination is a pivotal moment. Once the institutionalized spouse is first determined to be eligible for Medicaid, the Agency may look only at his individual resources (and not the community spouse's) in making determinations about his continued eligibility. *See* § 42 U.S.C. 1396r-5(c)(4). To this end, an institutionalized spouse cannot transfer disqualifying assets to the community spouse after he is determined to be eligible for benefits except for as provided by § 1396r-5(f)(1). Plaintiff's transfer did not fall into this limited exception–he transferred the money after he had initially been determined eligible for Medicaid, the transfer was well over the applicable CSRA, and the transfer occurred long after his initial determination of eligibility. Consequently, the penalty imposed by DSS was proper.

## III.   Conclusion

In sum, after DSS first found Mr. Fagan eligible for Medicaid, he was prohibited from transferring assets to his community spouse apart from the limited transfer provided for by Section 1396r-5(f)(1), as long as he remained continuously institutionalized, even if there was a break in

his eligibility and he reapplied and was again approved for benefits. This reading of the statute is required by the rules of statutory interpretation, consistent with the dual purposes of the statute, and follows from Morris's "watershed moment" analysis. Therefore, Defendant properly imposed a transfer of asset penalty on Mr. Fagan once he had been found eligible for Medicaid upon reapplication.

For the foregoing reasons, the Court finds that Defendant's imposition of a transfer of asset penalty was proper. Consequently Plaintiffs' Motion for Summary Judgment is DENIED and Defendant's Motion for Summary Judgment is GRANTED. The Clerk is requested to close this case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 21st day of March 2017.